**ATTACHMENT 1**

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEONARD BURRES, JULES COOPER, JAMES MONAHAN, NINA MONAHAN, and WALTER NEIT, | |
| Plaintiffs, | Case No. 04-C855 Judge David S. Cercone |
| v. | |
| FEDERATED EQUITY MANAGEMENT COMPANY OF PENNSYLVANIA, FEDERATED SECURITIES CORP., FEDERATED ADVISORY SERVICES COMPANY, FEDERATED ADMINISTRATIVE SERVICES, FEDERATED SHAREHOLDER SERVICES COMPANY, FEDERATED SERVICES COMPANY, FEDERATED GLOBAL INVESTMENT MANAGEMENT CORP., PASSPORT RESEARCH II, LTD., PASSPORT RESEARCH I, LTD., FEDERATED INVESTMENT MANAGEMENT COMPANY, and FEDERATED INVESTORS, INC., | (THIS COMPLAINT REGARDING EXCESSIVE FEES ALLEGES NO LATE TRADING OR MARKET TIMING CLAIMS) |
| Defendants. | |
| GARY M. BAUER, | Civil Action No.  04-702 (DSC) |
| Plaintiff, | |
| v. | |
| FEDERATED EQUITY MANAGEMENT COMPANY OF PENNSYLVANIA, et al., | |
| Defendants. | |

## CONSOLIDATED AMENDED COMPLAINT

This Consolidated Amended Complaint alleges breaches of fiduciary duty by Defendants in violation of Sections 36(b) and 48(a) of the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-35(b) and 15 U.S.C.A. § 80a-47(a), respectively.  Plaintiffs allege:

## I. JURISDICTION AND VENUE

1.      This action is a derivative action brought by Plaintiffs on behalf of the Federated Kaufmann Fund, the Federated Capital Income Fund, and the Federated High Income Bond Fund (collectively, the "Funds") pursuant to §§ 36(b) and 12(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. §§ 80a-35(b) and 80a-12(b).

2.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

3.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3).  Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

4.      All conditions precedent have been performed or have occurred.

## II. PARTIES

**A.      Plaintiffs**

5.       Plaintiff Leonard H. Burres is a resident of Goodyear, Arizona.  He is a shareholder at all relevant times of the Federated Kaufmann Fund.

6.      Plaintiff Jules Cooper is a resident of Largo, Florida.  He is a shareholder at all relevant times of the Federated Kaufmann Fund.

7.      Plaintiff James Monahan is a resident of Belleair Bluff, Florida.  He is a shareholder at all relevant times of the Federated Kaufmann Fund.

8.     Plaintiff Nina Monahan is a resident of Belleair Bluff, Florida.   She is a shareholder at all relevant times of the Federated Kaufmann Fund.

9.     Plaintiff Walter E. Neit is a resident of St. Petersburg, Florida.   He is a shareholder at all relevant times of the Federated Capital Income Fund.  The Federated Capital Income Fund is a registered investment company under the Investment Company Act of 1940 and a diversified portfolio of the Federated Income Securities Trust, a Massachusetts business trust.

10.     Plaintiff Gary M. Bauer is a resident of Belleville, Illinois.  He is a shareholder at all relevant times of the Federated High Income Bond Fund.

**B.     The Funds**

11.     The Federated Kaufmann Fund is a registered investment company under the Investment Company Act of 1940 and is a diversified portfolio of Federated Equity Funds, a Massachusetts business trust.

12.     The Federated Capital Income Fund is a registered investment company under the Investment Company Act of 1940 and a diversified portfolio of the Federated Income Securities Trust, a Massachusetts business trust.

13.     The Federated High Income Bond Fund is a registered investment company under the Investment Company Act of 1940.

**C.     Defendants**

14.     Defendant Federated Investors, Inc. ("FII") is a Pennsylvania corporation headquartered in Pittsburgh, Pennsylvania.   Federated's principal source of revenue is investment advisory fee income earned by various subsidiaries of Federated pursuant to

investment advisory contracts with the investment products.[1]   FII is sued based upon its misconduct related to its wrongful receipt of fee income in violation section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), and based upon its improper behavior as a control person within section 48(a) of the Investment Company Act of 1940 of certain of its subsidiary entities named as defendants who have violated provisions of the Investment Company Act of 1940, 15 U.S.C. § 80a-47(a) (prohibiting "directly or indirectly . . . acts or thing through or by means of any other person, which it would be unlawful for such person to do under the provision of this title or any rule, regulation or order thereunder").

15.    Defendant Federated Equity Management Company of Pennsylvania ("FEMCO") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940. FEMCO is currently the investment adviser to the Federated Kaufmann Fund and receives compensation from the fund for such services.

16.    Defendant Federated Global Investment Management Corp. ("FGIMCO") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940.  FGIMCO is the sub-adviser to the Federated Kaufmann Fund.  FEMCO, the adviser, has delegated daily management of the Federated Kaufmann Fund to FGIMCO, and FGIMCO is paid a portion of the fund's advisory fee.

17.    Defendant Passport Research II, Ltd. ("Passport") is a Pennsylvania limited partnership of which FEMCO is the general partner.  Passport is registered as an investment adviser under the Investment Advisers Act of 1940.  Passport is the investment adviser to the Federated Capital Income Fund and receives compensation from the fund for such services.

---

[1] Federated Investors, Inc. SEC Form 10-K for the fiscal year ended December 31, 2004 at p.2, available at http://sec.gov/Archives/edgar/data/1056288/000119312505042304/d10k.htm.

Defendant Passport Research I, Ltd. was the investment adviser to the Federated Capital Income Fund until December 31, 2003 and received compensation from the fund for such services.

18.     Defendant Federated Investment Management Company ("FIMCO") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940.  FIMCO is the investment adviser to the Federated High Income Bond Fund and is the sub-adviser of the Federated Capital Income Fund.  Passport, the adviser, has delegated daily management of the Federated Capital Income Fund to FIMCO, and FIMCO.  FIMCO also was the investment adviser to the Federated Kaufmann Fund until December 31, 2003.  FIMCO receives and/or received compensation from the Funds for such services.

19.     Defendant Federated Advisory Services Company ("FASC") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940.  FASC provides research, quantitative analysis, equity trading and transaction settlement and/or certain support services to the advisers to the Funds.  FASC is paid a portion of the Funds' advisory fees for such services.

20.     Defendant Federated Administrative Services ("FAS") is a Delaware corporation headquartered in Pittsburgh, Pennsylvania.  FAS provides administrative services to the Funds and receives compensation from the Funds for such services.

21.     Defendant Federated Shareholder Services Company ("FSSC") is a Delaware business trust headquartered in McCandless, Pennsylvania and was a transfer agent registered under the Securities and Exchange Act of 1934 until July 1, 2005.  FSSC maintains shareholder records for the Funds and receives compensation from the Funds for such services.  FSSC also provided transfer agent services for and until July 1, 2004 and received compensation from the Funds for such services.

22.     Defendant Federated Services Company ("FServC") is a Delaware business trust and the parent of Defendant FSSC.  Prior to July 1, 2004, FServC, through its subsidiary FSSC, served as the transfer agent for the Funds and received compensation from the Funds for such services.

23.     Defendant Federated Securities Corp. ("FSC") is a Delaware corporation and is registered as a broker-dealer under the laws of Florida.  FSC is the distributor and principal underwriter of the Funds and receives compensation from the Funds for such services.

24.     FEMCO, FGIMCO, Passport I and II, FIMCO, FASC, FAS, FSSC, FServC, and FSC, are all affiliated corporations owned by a common parent, Defendant Federated Investors, Inc.

### III.  BACKGROUND

25.     Plaintiffs are shareholders of the Funds, which are sold, advised, serviced, and/or managed with other funds as part of a fund family or complex of funds by Defendants (the "Federated Complex" or the "Fund Complex").

26.     Defendants, as the underwriters, distributors, advisers, affiliates, and/or control persons of the Funds, provide investment management and other services to the Fund Complex for compensation in the form of fees paid by Plaintiffs and other shareholders of the Funds.  As such, each Defendant owes fiduciary and other duties to Plaintiffs and all shareholders of each of the funds in the Fund Complex.

### A.     Section 36(b) of the Investment Company Act of 1940

27.     Section 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35(b), imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation.  In 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected…when investment companies are organized, operated [and] managed…in the interest of…investment advisers…rather than in the interest of [shareholders]…or when the investment companies…are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  Accordingly, the ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisers and their affiliates such as Defendants.

28.   In the 1960s, it became clear to Congress that investment advisers to equity mutual funds were gouging those funds with excessive fees, particularly by not taking economies of scale into account.  As a result, § 36(b), 15 U.S.C., § 80a-35(b), was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

29.   Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

30.   While the fees charged and received by Defendants may appear to be very small on a shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiffs' investment returns over time.  Arthur Levitt, past Chairman of the United States Securities and Exchange Commission ("SEC"), was critical of what he called the "tyranny of compounding high costs:"

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. ... In the years

ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural Address:  Costs Paid with Other People's Money, Address at

Fordham University School of Law,  6 Fordham J. Corp. & Fin. L. 261, 267 (2001).

**B.      Inherent Conflict in the Structure of Mutual Funds**

31.     The Federated Complex, like almost all other mutual fund complexes, operates under a single structure consisting of a group of related investment companies (the mutual funds themselves) that are owned by their shareholders and governed either by a Board of Trustees or a Board of Directors ("Board" or "Boards," collectively).  However, the mutual funds themselves are basically corporate shells in that they have few or no employees.  Instead, the mutual funds contract for all of the services they need -- including distribution of its securities, custodianship of its assets, auditing, servicing shareholder accounts, portfolio management, and day-to-day operation, all of which are provided by or arranged for by Defendants and their affiliates.

32.     The Federated Complex consists of dozens of mutual funds, all of which were conceived and started by the Defendants' or their predecessors.  The Defendants' purpose in starting, maintaining, and servicing mutual funds is to make a profit on the advisory, administrative, and shareholder services sold to the Funds for fee income to the service-providers.

33.     When the Defendants start a new mutual fund, they not only contract to provide all the services the funds need but also nominate and elect the members of the fund's Board, which consists of the same people that serve on the boards of all of the funds in the Fund Complex.

34.     In the case of the Funds at issue in this case, the Federated Kaufmann Fund and the Federated Capital Income Fund are governed by a Board of Trustees.  The Federated High

Income Bond Fund is governed by a Board of Directors.  The same individuals serve as trustees and directors for the Funds.  In fact, these individuals simultaneously serve on the Boards of and overseeing approximately 44 mutual funds (comprising over 130 portfolios) in the Fund Complex.

35.     The Board meets several times a year (approximately once a quarter).  The Board members are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component as well as retirement benefits.  For calendar year 2004, the independent Board members for the funds in the Fund Complex received total compensation in the following amounts:

| | |
|---|---|
| Thomas G. Bigley | $163,350 |
| John T. Conroy, Jr. | $163,350 |
| Nicholas P. Constantakis | $163,350 |
| John F. Cunningham | $148,500 |
| Peter E. Madden | $148,500 |
| Charles F. Mansfield, Jr. | $163,350 |
| John E. Murray, Jr. | $178,200 |
| Marjorie P. Smuts | $148,500 |
| John S. Walsh | $148,500 |

As a result, board membership in the Fund Complex is a lucrative part-time job, the continuation of which is dependent (at least in part) on the continued good will and support of Defendants.

36.     While mutual fund boards are supposed to be the "watchdogs" for the shareholders of the funds, two noteworthy industry insiders have commented on the general failure of mutual fund boards to fulfill their responsibilities under the ICA.  Jack Bogle, founder of the Vanguard Group, made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a bad joke.  They've watched industry fees go up year after year, they've added 12b-1 fees.  I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser.

It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the following comment, which was quoted by a United States District Court:

> I think independent directors have been anything but independent.  The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money.  The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management—whether management was good, bad, or indifferent.  Not negotiate for fee reductions and so on.  A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans.  I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp.2d 373, 383 (S.D.N.Y. 2002) (citation omitted).  Mr. Buffet has also stated, in his letter to shareholders in the 2002 Berkshire Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent" mutual-fund director will suggest that his fund look at other managers, even if the incumbent manager has persistently delivered substandard performance.  When they are handling their own money…directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others. . . . Investment company directors have failed as well in negotiating management fees . . . If you or I were empowered, I can assure you that we could easily negotiate materially lower management fees with the incumbent managers of most mutual funds.  And, believe me, if directors were promised a portion of any fee savings they realized, the skies would be filled with falling fees.  Under the current system, though, reductions mean nothing to "independent" directors while meaning everything to managers.  So guess who wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably.  (They've succeeded, however, in taking care of themselves; their fees from serving on multiple boards of a single "family" of funds often run well into six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

37.     The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are

organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."

**C.     Prior Breaches of Fiduciary Duty by Federated**

38.     On November 28, 2005, the SEC issued an order finding that Defendants FIMCO, FSC, and FSSC had engaged in serious illegal activity. Specifically, the SEC found the companies had entered into negotiated, but undisclosed, market timing agreements with individuals and entities that allowed them to "market time" certain Federated Funds including the Federated Kaufmann Fund.  Securities Exchange Act Release No. 2448, ¶¶ 1, 14 (Nov. 28, 2005)("SEC Release 2448")(Exhibit 1.).

39.     The Attorney General of the State of New York similarly found that Defendants FII, FIMCO, FSC, and FSSC breached their fiduciary obligations to shareholders of the affected mutual funds by entering into the undisclosed market timing arrangements with preferred customers and allowing harmful trading activities.  *See* Attorney General of the State of New York Assurance of Discontinuance Pursuant to Executive Law § 63(15), ¶¶ 3-4 (Nov. 17, 2005)("NYAG Assurance of Discontinuance") (Exhibit 2.).

40.     In the period between January 2003 and July 2003, approximately $265 million in market timing transactions in the Kaufmann Fund were conducted.  *Id.* at ¶ 12.  Despite prospectus disclosures and internal procedures designed to prevent market timing, Defendants FIMCO and FSC approved "timing capacity" in certain mutual funds for certain entities without ever disclosing these arrangements to other Federated Fund shareholders.  SEC Release 2448 at ¶¶ 2.  Some of the agreements were made with the understanding that the market timer would make a separate investment of non-timed "sticky assets" in other Federated funds.  *Id.*  In

addition, Defendant FSSC allowed late trading by improperly processing trades received after 4:00 p.m. at the current day's net asset value.  *Id.* at ¶ 28.

41.     Both Defendants FIMCO and FSC recognized that the assets they brought to the Federated funds under the market timing agreements would serve to increase their advisory and other fees while increasing costs for long-term shareholders, thereby placing them in a conflict of interest situation with the funds.  *Id.* at ¶ 2.  Finally, the SEC found that Defendant FIMCO breached its fiduciary duty to its respective funds by, *inter alia*, entering into market timing arrangements that created a conflict of interest which Defendant FIMCO knowingly or recklessly failed to disclose to the Federated Funds' shareholders and Boards of Trustees.  SEC Release 2448 at ¶ 31.  Accordingly, the SEC found that "while acting as an investment adviser, [FIMCO] employed devices, schemes, or artifices to defraud investors or prospective investors, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon investors or prospective investors."  *Id.*  The SEC found that Defendant FSC willfully aided and abetted FIMCO by knowingly providing substantial assistance to FIMCO. *Id.*

42.     Similarly, the Attorney General of the State of New York found that "Federated entered into undisclosed market timing arrangements with preferred customers knowing or recklessly disregarding that these arrangements would (and did) negatively impact the investment returns of Federated's mutual fund shareholders."   NYAG Assurance of Discontinuance, ¶3.  Federated's  incentive for allowing timers "was the investment advisory and other fees earned on the timing assets…[With] 'sticky money' arrangement[s], the timer made additional fee-generating investments in Federated-managed investments as an inducement or reward for the right to 'time' Federated mutual funds."  *Id.* at ¶5.

43.     Defendants FIMCO, FSC, and FSSC agreed to a total payment of $72 million consisting of $45 million in civil penalties and $27 million in disgorgement to settle the civil enforcement actions and investigations related to market timing brought by the Attorney General of New York as well as the SEC.  This amount did not include the $8 million restoration fund that Defendant FII previously had established for the harmed Federated funds.  Finally,  FIMCO agreed to cut its management fees for the affected funds by $4 million per year over five years for a total reduction of $20,000,000.  These cuts will be woefully inadequate, as Defendants' advisory and other fees are and will remain grossly excessive.

44.     Unethical and illegal actions such as those of Defendants and/or their affiliates support Former Senator Peter Fitzgerald's characterization of the mutual fund industry as "the world's largest skimming operation – a $7 trillion trough from which fund managers, brokers, and other insiders are steadily siphoning off an excessive slice of the nation's household, college, and retirement savings."  Press Release, United States Senate, Fitzgerald: Time For Congress To Give  Ordinary  Americans  Same  Mutual  Fund  Deal  It  Has  Given  Itself  (January  27, 2004)(available at http://web.archive.org/web/20040121034333/fitzgerald.senate.gov/).

45.     The  unlawful  market  timing  behavior  of  Defendants  and/or  their  affiliates demonstrates  their  willingness  to  breach  their  fiduciary  duties  to  their  funds  and  their shareholders in an effort to increase the compensation Defendants receive.  As explained by New York Attorney General Eliot Spitzer in his testimony before the United States Senate Banking, Housing, and Urban Affairs Committee on November 20, 2003:

> Some have questioned whether there is a nexus between the inquiry into fees that I am proposing and the investigation into the trading activities permitted by fund managers.  The answer is yes.  The improper trading and the exorbitant fees charged are both consequences of the governance structure that permitted managers to enrich themselves at the expense of

investors.  We know that directors and managers breached their duties to investors in ever conceivable manner…Moreover, the nexus between fees and the improper trading that we have uncovered is demonstrated by the fact that the managers who permitted late trading and market timing in many instances did so in return for increased investments in other funds that they managed.  Mutual fund managers get paid a percentage of the funds under management, and therefore seek to increase their funds' asset base to increase their compensation…Simply stated, the desire for increased fees led managers and directors to abandon their duty to investors and to condone improper and illegal activity.  Common sense demands that we at least inquire whether the desire for increased fees also resulted in fee agreements and charges that were improper.

46.     As they did with the unlawful market timing agreements, Defendants also have breached their fiduciary duties to the funds by receiving excessive fees.

**D.      Nature of Relief Requested**

47.     In this action, Plaintiffs sue Defendants for the use and benefit of the Funds. Plaintiffs seek to rescind certain investment advisory, administration, distribution, and/or other agreements by which Defendants have improperly enriched themselves, including by charging excessive advisory, administration, and distribution fees.  Plaintiffs seek to recover the total fees charged by Defendants or, alternatively, to recover the excess profits resulting from economies of scale wrongfully retained by Defendants and to recover other excessive compensation received by, or improper payments wrongfully retained by, Defendants in breach of their fiduciary duty under ICA § 36(b), 15 U.S.C. § 80a-35(b). Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a period commencing at the earliest date in light of any applicable statute of limitations and continuing through the date of final judgment after trial.[2]

---

[2] Pursuant to the Court's November 16, 2005 Order, the claims for the Federated Kaufmann Fund will commence February 24, 2004.

48.     No pre-suit demand on the board of directors of the Funds is required, as the requirements of F.R.C.P. 23.1 do not apply to actions under § 36(b) of the ICA. *Daily Income Fund v. Fox,* 464 U.S. 523 (1984).

49.     Plaintiffs do not allege or seek relief for any claims based upon improper market timing or late trading activity involving the Funds.

### IV.  SUBSTANTIVE ALLEGATIONS

**A.     Fees Paid By Plaintiffs and Other Shareholders**

50.     Defendants or their affiliates manage and/or provide services to the Funds for substantial fees.  According to Morningstar, a provider of independent investment research, Defendant FII is a fund company with above-average fees.  Michael Brush, MSN Money, Untainted Fund Companies Win as Rivals 'Fess Up (Nov. 19, 2003), http://moneycentral.msn.com/content/P64219.asp.

### *(1) Portfolio Advisory Fees*

51.     Plaintiffs and the other shareholders of the Funds pay Defendants fees for providing investment advisory services pursuant to Advisory Agreements.  Defendants receive an annual investment advisory fee of 1.425% of the Kaufmann Fund's average daily net assets and 0.75% of the average daily net assets for both the Capital Income Fund and the High Income Bond Fund.

52.     In percentage terms, these fees may at first look benign. However, in dollar terms, and in comparison to fees received by Defendants for managing other virtually identical institutional portfolios, the fees received from the Funds are staggering and excessive.  *See* Section IV.B.(3), *infra.* For fiscal years 2004, the Funds paid the following advisory fees:

| **Fund Name** | **Fiscal Year End Date** | **2004 Advisory Fees** |
|---|---|---|
| Federated Kaufmann Fund | Oct. 31 | $81,991,326 |
| Federated Capital Income Fund | Nov. 30 | $3,587,071 |
| Federated High Income Bond Fund | Mar. 31 | $13,992,808 |

53.     The investment advisory services Defendants provide to the Funds are identical to the investment advisory services Defendants or their affiliates provide to other clients (such as institutional clients) and entail identical costs.  In fact, the cost of managers, analysts, research data, the physical plant, and other aspects of Defendants' investment advisory services are shared between the mutual funds and the other clients.

54.     Despite the equivalence of the investment advisory services Defendants provide to the Funds and the other clients, the fees Defendants receive from the Funds for investment advisory services are much higher than the fees Defendants or its affiliates receive from other clients for the identical services.  *See* Comparative Fee Structures, Section IV.B.3., *infra*.

### (2) Administrative Fees

55.     In addition to the Advisory Fees, the Funds pay administrative fees for other services provided to the Funds including: transfer agency, custody, accounting, and legal services; other administrative, operational, and shareholder services; and the associated expenses for such services.  These administrative fees amount to millions of dollars paid by the Funds that generate profits for Defendants, their affiliates, and third parties.  Defendants have breached their fiduciary duty to the Funds by extracting from or allowing for the payment of excessive administrative fees by the Funds.

56.     Until July 1, 2004, FServC, thought its subsidiary FSSC, served as the transfer agent for the Funds.  For the fiscal year 2004 up until June 30, 2004 and fiscal year 2003, the Funds paid the following amounts to FSSC:

| Fund Name | 2004 FY End Date | Fiscal Year 2004 Transfer Agency Fees | Fiscal Year 2003 Transfer Agency Fees |
|---|---|---|---|
| Federated Kaufmann Fund | Oct. 31 | $4,841,248 | $6,984,213 |
| Federated Capital Income Fund | Nov. 30 | $457,363 | $941,524 |
| Federated High Income Bond Fund | Mar. 31 | $504,642 | $1,898,669 |

57.     Pursuant to the Shareholder Services Agreement, the Funds also compensate Defendant FSSC for certain services for shareholders and for maintaining shareholder accounts. In fiscal year 2004, the Funds paid the following amounts for administrative services:

| Fund Name | Fiscal Year End Date | 2004 Administrative Fees |
|---|---|---|
| Federated Kaufmann Fund | Oct. 31 | $31,642,772 |
| Federated Capital Income Fund | Nov. 30 | $2,834,828 |
| Federated High Income Bond Fund | Mar. 31 | $9,078,267 |

58.     For other administrative and shareholder services, including custody, fees paid to the independent trustees or directors, independent counsel, and independent auditors, and other costs and expenses, the Funds paid to third parties the following amounts in fiscal year 2004:

| Fund Name | Fiscal Year End Date | 2004 Other Fees |
|---|---|---|
| Federated Kaufmann Fund | Oct. 31 | $1,362,812 |
| Federated Capital Income Fund | Nov. 30 | $371,299 |
| Federated High Income Bond Fund | Mar. 31 | $656,771 |

59.     Comparing the administrative fees charged by Defendants to the Funds to administrative costs by peer mutual funds, it is evident that Federated gouges its shareholders at every available opportunity.  *See* Comparative Fee Structures, Section IV.B.3., *infra*.

### (3) Rule 12b-1 Distribution Fees

60.     Plaintiffs and the other shareholders of the Funds also paid distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendants adopted with respect to the Funds pursuant to Rule 12b-l, 17 C.F.R. § 270.12b-1 ("Distribution Plans").   The distribution fees are paid to Defendant FSC. The distribution fees are based on a percentage of the net assets of each of the Funds. Defendants purportedly collect these fees in order to grow or stabilize the assets of the Funds so that the Funds can benefit from economies of scale through reduced advisory and administrative fees.

61.     Prior to 1980, the use of fund assets (which are owned by the shareholders) to sell new fund shares was prohibited.  The SEC had historically been reluctant to allow fund advisers to charge their shareholders for selling shares to others because:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

62.     After intense lobbying by the mutual fund industry, the Commission agreed to consider modifying its objections to allow current fund shareholders to pay distribution expenses.  In early comment letters and in proxy statements proposing adoption of plans of

distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

63.     Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in fees and other expenses, the Commission tentatively approved Rule 12b-l, 17 C.F.R. § 270.12b-1.  However, numerous conditions were attached to the use of fund assets to pay distribution expenses.  For example, the Commission wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan."  *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).  Unfortunately, that is precisely what Defendants have done: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to acquire new shareholders so that these new shareholders could pay additional advisory fees to Defendants.  Under this regime and just as they did with their illegal market-timing scheme, Defendants have fashioned yet another way to increase their financial benefit while leaving Plaintiffs to bear the financial burden.

64.     Furthermore, the distribution fees are based on the net asset value of the Funds and not on the distribution activity, if any, by Defendants, such as number of shares sold. Consequently, in addition to failing to benefit Plaintiffs and other shareholders, the Distribution Plans have extracted additional compensation for advisory services to Defendants, thereby resulting in excessive fees paid to them.  For example, any portion of the fees paid to Defendants that are derived from market increases in the net asset value of the fund rather than any distribution activity by Defendants constitutes additional and excessive compensation for advisory services.

65.     Defendants have received the following 12b-1 payments for each share class for fiscal year 2004:

| Fund Name | Class A | Class B | Class C | Class K/F |
|---|---|---|---|---|
| Federated Kaufmann Fund | 2,961,577 | 6,841,676 | 3,431,959 | 6,468,374 |
| Federated Capital Income Fund | n/a | 359,169 | 138,618 | n/a |
| Federated High Income Bond Fund | n/a | 6,359,159 | 1,676,084 | n/a |

66.     Distribution fees have served only Defendants, just as the SEC feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  As such, the distribution fees are entirely a waste of fund assets.  The wrongdoing is especially blatant in the case of the Federated Kaufmann Fund which has been closed to new investors since 2001 (other than the brokerages that were already selling the fund prior to its closing) so that is not possible for the fees to accomplish their chief purported purpose, i.e. growth through sales to new individual investors.

67.     Plaintiffs, on behalf of the Funds, are entitled to recover the excessive distribution fees received (and continuing to be received) by Defendants.

**B.      Defendants' Breach of Their Fiduciary Duty with Respect to Compensation**

68.     Defendants have breached their fiduciary duty pursuant to § 36(b) of the ICA with respect to their receipt of advisory fees, administrative fees, and/or distribution fees from the Funds because the fees they received are excessive and were not negotiated at arms length.

69.     Morningstar has evaluated governance aspects of the Funds and awarded them dismal grades.   Its evaluation depicts the Federated Fund family as troubled.   For example, Morningstar has assigned "Stewardship Grades" to 1109 open-end mutual funds, including all of the largest mutual funds.   These stewardship grades, which were originally called "Fiduciary Grades," reflect Morningstar's view of the extent to which the fund is administered to fulfill its fiduciary duties to shareholders.   Of the 1108 open-end mutual funds Morningstar graded as of January 10, 2006, only 18 received a failing stewardship grade of "F."   Amongst those 18 receiving an "F" for overall stewardship are all three of the funds at issue in this Complaint.

70.     All three funds also ranked "very poor" as far as regulatory issues, "poor" as far as corporate culture, and only "fair" in relation to board quality.   With regard to fees, Morningstar rated both the Federated Kaufmann Fund and Federated High Income Bond Fund as very poor; the Federated Capital Income Fund was rated as only fair.   Morningstar's ratings brand the Funds as troubled funds, and they are troubled for the reasons alleged in this complaint: service providers intent on price-gouging and dismal board oversight, both leading to unremitting fiduciary duty breaches.   The Funds' corporate culture needs to be tested under the stringent fiduciary duty standards established by Congress to protect mutual fund shareholders, and this lawsuit does that.

71.     The essence of a claim for unfair fees is whether "defendants charge plaintiffs much higher fees than other clients for equivalent services."[3]

72.     Other factors which also may be relevant to determining whether Defendants have breached their fiduciary duty pursuant to § 36(b) include, but are not limited to: (1) the extent to

---

[3] *See ING Principal Protection Funds Derivative Litig.*, 369 F.Supp.2d 163, 169 n.35 (D. Mass. 2005)(citing *Strigliabotti v. Franklin Res., Inc.,* 2005 U.S. Dist. LEXIS 9625, No. 04-00883 SI, 2005 WL 645539, *3 (N.D. Cal. Mar. 7, 2005).

which benefits derived from the economies of scale realized as the fund grows have inured to the benefit of fund shareholders;  (2) the nature and quality of the services rendered; (3) comparative fee structures; (4) the profitability of the funds to the advisor/manager; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds; and (6) the care and conscientiousness of the directors.  A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendants to the Funds violate § 36(b).

### *(1) Economies of Scale*

73.     When a mutual fund is new and/or small in size, it is less profitable for the Defendant.  As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year.  A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of *thirty-seven million, five hundred thousand dollars ($37,500,000) per year.*

74.     Economies of scale are created when (as with the Funds) assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.

75.     While this is true for virtually all services provided to a mutual fund, it is particularly true for the work required in the area of investment advisory services.  It does not cost the fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund; in fact, the investment advisory services or securities selection process for a ten billion dollar fund and a one

million dollar fund are virtually identical, generating enormous economies of scale.  According to one fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "staggering."  At some point (exceeded by the Funds because of their large size), the additional cost to advise each additional dollar in the Funds (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

76.     Advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b).  Further, as assets under management increase, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.  In fact, with very large funds (such as those at issue in this case), the cost of servicing the additional assets approaches zero.  Accordingly, any fees received in connection with the additional assets represent almost pure profit.  Nonetheless, the distribution, administrative, and advisory fees paid to Defendants have grown dramatically.  *See* Comparative Fee Structures, Section IV.B.3., *infra*.  However, as the fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are disproportionately large in relationship to the services rendered to Plaintiffs, the excess profits resulting from these economies of scale belong to Plaintiffs and the other shareholders of the Funds.

77.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of advisory services.  *See* SEC Division of Investment Management:

Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 (Exhibit 3.);

GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous

Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June

2000) ("GAO Report"), at 9 (Exhibit 4.).

78.     These economies of scale exist not only fund by fund but also exist with respect

to an entire fund complex and even with respect to an investment advisor's entire scope of

operations, including services provided to institutional and other clients.[4]

79.     The clearest example of economies of scale occurs when total assets under

management increase due purely to market forces (without the institution of new advisory

relationships or new asset gathering).  In such instances, as the GAO confirms, it is possible for

the adviser to service the additional assets with zero additional costs.  See GAO Report at 9

(noting that growth from portfolio appreciation is unaccompanied by costs) (Ex. 4)  In other

words, an investment adviser can advise a fund that doubles in size purely because of market

forces with no increased costs because the services are unchanged.  *See* id. (Ex. 4).

80.     Economies of scale exist for the Federated funds; they are just being appropriated

for the benefit of the service-provider managers of those funds.  Thus, fund shareholders are

suffering by being deprived of the benefits that their financial participation (not the managers')

creates.  The economies of scale benefits that have been captured and misappropriated by

Defendants can and do generate huge excessive, undeserved profits for the Defendants.  These

profits have been improperly misappropriated from the mutual funds by, in part, depriving fund

shareholders from the benefits of economies of scale.  These benefits can (at least in part) be

---

[4] *See* Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993).

shared with the mutual funds and their shareholders by reducing the advisory fees and other costs charged to the Funds by Defendants.

81.     In the case of the mutual funds at issue in this case, no meaningful savings have been shared with the Funds.  Defendants' price gouging on service charges has been complex-wide, unremitting, and massive. For example:

- Over the nine year span from 1996 through 2004, assets held by the Kaufmann Fund increased by 28 percent, from $5.34 billion to $6.86 billion.  Over the same period, advisory fees net of waivers or reimbursements not only grew greatly in dollar terms, from $60 million to $82 million, but also in terms of a percentage of net assets, from 1.03 percent to 1.19 percent.  In other words, $1.5 billion dollars in added assets yielded not a fee reduction but a fee hike passed on to the Kaufmann Fund's shareholders.

- The Kaufmann Fund's managers' price-gouging on shareholder service fees is even worse.  Here again, we see expense increases outpacing asset growth.  In 1996, shareholder service fees for the Kaufmann Fund amounted to $14 million, or 0.23 percent of net assets.  By 2004, these same fees had more than doubled, ballooning to $31 million, accounting for 0.45 percent of net assets.

- According to data available on Morningstar's web site, the Federated Kaufmann Fund has the highest expense ratio of *all* of the 266 large open-end mutual funds, where "large" is defined as "funds with $4.5 billion or more in assets."

- Over the decade extending from 1995 through 2004, Capital Income Fund featured the same pattern as Kaufmann with inflated advisory fees.  In 1995, assets of nearly $820 million yielded net advisory fees (after waivers and reimbursements) of $4.66 million, reflecting an advisory fee expense ratio of 0.56 percent.  Ten years later, at the end of 2004, assets had decreased to $491 million, and advisory fee income had decreased as well, to $3.6 million.  What had not decreased was the expense ratio of advisory fees to assets, which soared from 0.56 percent to more than 0.73 percent.

- The third fund held by the Plaintiff shareholders, Federated High Income Bond Fund, also features outsized advisory fee and expense ratios.  Over the 10-plus year period extending from March of 1994 through November of 2004, Federated High Income Bond Fund's assets grew impressively, from $464 million to $1.7 billion, an increase of 370 percent.  Predictably, net advisory fees (after waivers and reimbursements) grew faster, rising from $3.2 million to $14.1 million, an increase of 440 percent.  Fees for service from the fund's transfer agent and dividend disbursing agent grew over the same period by 490 percent, from

$416,000, to $2.04 million.  Likewise, the High Income Bond Fund's shareholders services fees exploded from around $790,000 in March of 1994 to $4.6 million in 2004, an increase of 580 percent.

The foregoing figures make a mockery of the concept of economies of scale.

82.     The economies of scale enjoyed by Defendants with respect to the Funds have not been shared with Plaintiffs as required by § 36(b) and Rule 12b-1.  As a result, the fees paid to Defendants for advisory services provided to the Funds are grossly disproportionate to those services, are excessive, and violate § 36(b).

*(2) The Nature and Quality of the Services Provided to the Funds*

83.     A basic problem with the Funds is that they are grossly over-priced for the services they provide.  This is a consistent problem with all of the Funds as described in detail below.

84.     The nature of the investment advisory services provided to the Funds is straightforward:  Defendants buy and sell, at their discretion, stocks, bonds, and other securities for the Funds.  This is precisely the same service provided to Defendants' institutional and other clients (albeit at a dramatically lower cost).

85.     On information and belief, the materials provided by Defendants to the directors of the Funds establish that the nature of the services Defendants render to the Funds has remained unchanged despite dramatic growth in the assets of the Funds and advisory revenues.

86.     Despite the fact that the Funds receive identical investment advisory services as Defendants' institutional and other clients, upon information and belief, Plaintiffs pay Defendants dramatically higher fees because these fees are not negotiated at arm's length as they are with the institutional and other clients.  This disparity in fees evinces Defendants' willingness

and determination to prefer their own financial interests to the interests of the Funds and the shareholders of the Funds.

87.     Upon information and belief, Defendants repeatedly put their own financial interests ahead of the interests of the Funds and the shareholders of the Funds by participating in arrangements and schemes that benefit Defendants at the expense of the Funds and the shareholders of the Funds.  The cost of this conflict of interest, which does not exist in the case of the arm's-length relationships with institutional clients, is manifest not only in higher fees, but in other losses and expenses borne by the Funds and the shareholders of the Funds.  These losses and expenses directly impact the quality of the investment advisory services Defendants provide to the Funds.  *See* Section III.C, *supra*.

88.     Defendants are also willing and determined to put their own financial interests ahead of the Funds and the shareholders of the Funds by using fund assets to participate in improper distribution practices and other practices, including arrangements commonly referred to as pay-to-play or shelf space schemes as well as other directed brokerage practices.  In the case of the pay-to-play or shelf space schemes, Defendants direct the Funds' brokerage business to and pay above-market rates to brokerage firms that promote Defendants' mutual funds over other funds.  Edward Jones has disclosed that Federated Investors was one of the fund families with which it shared such revenues in agreements that were undisclosed to their fund customers. In the case of other directed brokerage practices, Defendants direct the Funds' brokerage business to and pay above-market rates to brokerage firms that provide research and other products and services in addition to execution of portfolio transactions.  In fiscal year 2004 alone, Defendants caused the Funds to pay brokerage commissions in the following amounts to firms that provided research services in addition to execution:

| Fund Name | Fiscal Year End Date | 2004 Directed Brokerage Commissions |
|-----------|----------------------|-------------------------------------|
| Federated Kaufmann Fund | Oct. 31 | $17,856,180 |
| Federated Capital Income Fund | Nov. 30 | $300,630 |

89.     The use of brokerage payments for marketing causes the expense ratio of a fund to be understated.  In addition, such payments are illegal since they represent "off-the-books" payments to subsidize distribution outside the strictures of Rule 12b-1.

### (3) Comparative Fee Structures

90.     The fees advisers receive from mutual funds for investment advisory services are directly comparable to, though much higher than, the fees advisers receive from other clients for the identical services.   "[A] manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, [however,] . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds.  The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower."  John P. Freeman  & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610, 627-28 (2001) (Exhibit 5.).

91.     More recently, New York Attorney General Eliot Spitzer surveyed two fund complexes and confirmed the existence of massive over-charging of fund advisory fees.  Mr. Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for advisory services than Putnam's institutional investors.  In dollar terms, what this fee disparity means is that in 2002 Putnam mutual fund investors paid $290

million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients, and these are for identical services.

There was a similar disparity in the advisory fees charged by Alliance. Once again, mutual fund investors were charged significantly higher advisory fees than institutional investors. Specifically, Alliance's mutual fund investors paid advisory fees that were twice those paid by institutional investors. In dollar terms, this means that Alliance investors paid more than $200 million more in advisory fees than they would have paid had they been charged the rate given to Alliance's institutional clients.

92.    On information and belief, the shareholders of the Funds at issue here are plagued by the same discriminatory over-charging by Defendants as the shareholders of the funds mentioned by Mr. Spitzer in his Senate testimony.

93.    A comparison of the Funds' portfolio advisory fees with sample fees for pension portfolio advisory services, which are virtually identical in substance, shows massive price gouging by every one of the Funds, **_totaling over $87 million annually._**

| Fund Name | Morningstar Category | Prospectus Objective | Net Assets $MM | Advisory Fees | Pension Average | Annual "excess" Fees | Annual Dollar "excess" Fees |
|---|---|---|---|---|---|---|---|
| Federated Kaufmann | Mid-Cap Growth | Aggressive Growth | 7,608 | 1.425 | 0.42 | 1.005 | 76,460,400 |
| Federated Capital Inc | Conservative Allocation | Balanced | 498 | 0.750 | 0.21 | 0.540 | 2,688,120 |
| Federated High Income Bond | High Yield Bond | Corp Bond-High Yield | 1,630 | 0.750 | 0.26 | 0.490 | 7,986,020 |
| Totals | | | | | | | 87,134,540 |

94.    Defendants and their affiliates routinely offer their services to institutional and other clients for fees much lower than the investment advisory fees they charge the Funds. For example:

a.    Defendant FIMCO serves as sub-adviser to the Principal Partners LargeCap Blend Fund, Inc., and charges a fee of .35% of the first $75 million of assets, .25% of the next $200 million, .20% of the next $250 million and .15% of assets above $525 million. By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently

1.425%.  Had the same fee structure been used, the Federated Kaufmann Fund would pay over $97 million less in advisory fees each year.

b.        Federated Investment Counseling ("FIC")[5] charges a fee of .40% of the first $50 million in assets, .25% of the next $200 million in assets, .20% of the next $250 million in assets, and .15% of assets in excess of $500 million for the sub-advisory services it renders to the Nationwide High Income Bond Fund and the Nationwide Equity Income Fund.  By contrast, the advisory fee paid by both the Federated Capital Income Fund and Federated High Income Bond Fund to the Defendants is currently 0.75%.  Had the same fee structure been used, the Capital Income Fund would pay almost $3 million less in advisory fees each year while the High Income Bond Fund would pay almost $10 million less in advisory fees each year.

c.        FIC charges a fee of .25% of the first $200 million in assets and .20% of assets in excess of $200 million for the investment management services it renders to the ASAF Federated High Yield Bond Fund.  By contrast, the advisory fee paid by the Federated High Income Bond Fund to the Defendants is currently 0.75%. Had the same fee structure been used, the High Income Bond Fund would pay almost $9 million less in advisory fees each year.

d.        FIC serves as sub-adviser to the WRL Federated Growth & Income Portfolio of the AEGON/Transamerica Series Fund, Inc., a mutual fund which underlies a variable annuity product.  For the sub-advisory services rendered to that mutual fund, FIC charges a fee equivalent to .50% of the first $30 million in assets, .35% of the next $20 million, and .25% of assets in excess of $50 million.  By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.425%.  Had the same fee structure been used, the Federated Kaufmann Fund would pay almost $90 million less in advisory fees each year.

e.        FIC charges a fee of .50% of the first $100 million in assets, .45% of the next $300 million in assets, .40% of the next $500 million in assets, and .35% of assets in excess of $900 million, for the sub-advisory services it renders to the AST Federated Aggressive Growth Portfolio.  By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.425%.  Had the same fee structure been used, the Federated

---

[5] FIC is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940.  FIC is affiliated with the Defendants and is owned by Defendant Federated Investors, Inc.  FIC provides investment advisory services to third parties such as institutional investors and sub-advisory services to other mutual funds and, upon information and belief, charges substantially lower fees for providing those services than its affiliates charge for providing similar services to the Funds.

Kaufmann Fund would pay almost $82 million less in advisory fees each year.

These comparative fee structures (including Defendants' sub-advisory relationships) demonstrate that Defendants are charging advisory fees to the Funds that are disproportionate to the value of the services rendered.

95.     That Defendants are able to manage strangers' money for far lower fees than they are charging the Funds' shareholders, to whom fiduciary duties are owed based on the common law and federal statute, shows Defendants have completely abdicated their fiduciary responsibility of fair dealing to the funds and the funds shareholders when it comes to providing advisory services.

96.     Likewise, if the Funds are compared with peer mutual funds ("Mutual Fund Average Advisory Fee"), an industry where price competition is notoriously lacking, price gouging for advisory services by the Federated asset manager is also readily seen with excessive fees totaling ***almost $63 million per year.***

| Fund Name | Morningstar Category | Prospectus Objective | Net Assets $MM | Advisory Fees | Mutual Fund Average Advisory Fee | Annual "excess" Fees | Annual Dollar "excess" Fees |
|-----------|---------------------|---------------------|---------------|--------------|----------------------------------|---------------------|----------------------------|
| Federated Kaufmann | Mid-Cap Growth | Aggressive Growth | 7,608 | 1.425 | 0.651 | 0.774 | 58,885,920 |
| Federated Capital Inc | Conservative Allocation | Balanced | 498 | 0.750 | 0.604 | 0.146 | 726,788 |
| Federated High Income Bond | High Yield Bond | Corp Bond-High Yield | 1,630 | 0.750 | 0.546 | 0.204 | 3,324,792 |
| Totals | | | | | | | 62,937,500 |

97.     Defendants' price-gouging is not limited to advisory fees.  Set forth below is a chart contrasting the administrative fees charged the Funds annually with administrative fees charged for peer mutual funds ("Mutual Fund Average Admin Fee").

| Fund Name | Morningstar Category | Prospectus Objective | Net Assets $MM | Admin Fees | Mutual Fund Average Admin Fee | Annual "excess" Admin Fees | Annual Dollar "excess" Admin Fees |
|---|---|---|---|---|---|---|---|
| Federated Kaufmann | Mid-Cap Growth | Aggressive Growth | 7,608 | 0.415 | 0.233 | 0.182 | 13,854,750 |
| Federated Capital Inc | Conservative Allocation | Balanced | 498 | 0.538 | 0.191 | 0.347 | 1,726,222 |
| Federated High Income Bond | High Yield Bond | Corp Bond-High Yield | 1,630 | 0.470 | 0.261 | 0.209 | 3,406,282 |
| Totals | | | | | | | 18,987,254 |

98.     As a rule of thumb, an absolute upper bound for administrative costs for a mutual fund is 25 basis points, as set forth in the study published by the Zero Alpha Group on Mutual Fund Transaction Costs.   Karceski, Jason, Miles Livingston, Edward O'Neal, "Portfolio Transaction Costs at U.S. Equity Mutual Funds," Working Paper.  The Zero Alpha study authors determined that the average expense ratio for Index funds within Domestic Equity is 25 basis points. This number represents the all-in cost for administration, a limited amount of investment capability and compensation for the entrepreneurial risk borne by the fund sponsor in creating the fund. While administrative costs may be the largest component of this 25 basis point cost, it is by no means the entirety of it.

99.     In reality, the true administrative costs for the Funds should be significantly lower than even the 25 basis points benchmark. Several outside parties that provide all the administrative services required for a mutual and charge for these services. In other words, there is a free market test for mutual fund administrative costs.

100.    In particular, a leading shareholder servicing firm PFPC, a subsidiary of PNC bank, offers a turnkey solution for mutual funds. This solution is sometimes referred to as a "mutual fund in a box" and provides a Board of Directors, an Administrator, a Transfer Agent, a Custodian, Underwriter, Independent Public Accountant and Fund Counsel within The RBB

Fund, Inc. "RBB" is a registered open end series fund company through which many investment management firms offer their mutual funds. The cost for this service is well below the aforementioned 25 basis point benchmark, and features the following fee schedule:

    .15% of the first $250 million
    .12% on the next $250 million
    .10% on the next $250 million
    .08% on the next $750 million
    .06% on assets over $1.5 billion

101.    The American Funds' Washington Mutual Fund provides another example of the real costs of administrative fees.  The American Funds' Washington Mutual Fund reports separately (unlike the Funds) the portion of their total management fee attributable to administrative costs as being between 0.089% (8.9 basis points) of total net assets) to as low as 0.04% (4 basis points) of net assets under management, also demonstrating that economies of scale exist with respect to administrative costs. Further, Vanguard has reported administrative fees for the Vanguard U.S. Growth Fund, a large ($6 billion) managed growth fund, of  0.10% (10 basis points) and the Vanguard Selected Value Fund, their $3.3 billion mid-cap value fund, at 0.02% (2 basis points).

102.    Needless to say, the administrative costs charged by Defendants against the Funds and their shareholders are vastly in excess of the fees charged on the free market for like services.  Defendants have taken a cost item, administrative expenses, and turned it into a profit center for themselves.  Either that, or they need to start outsourcing administrative functions to service providers who will charge competitive, fair fees.  Plainly, fiduciary obligations have been breached in the assessment and collection of both advisory fees and administrative fees.

103.    Combining portfolio management and administrative costs into a single number referred to below as "Operating Expenses" shows the Federated Funds still sporting excessive fee loads:

| Fund Name | Morningstar Category | Prospectus Objective | Net Assets $MM | Operating Expenses | Mutual Fund Average Op Exp | Annual "excess" Operating Expenses | Annual Dollar "excess" Operating Expenses |
|---|---|---|---|---|---|---|---|
| Federated Kaufmann | Mid-Cap Growth | Aggressive Growth | 7,608 | 1.840 | 0.884 | 0.956 | 72,740,670 |
| Federated Capital Inc | Conservative Allocation | Balanced | 498 | 1.288 | 0.795 | 0.493 | 2,453,010 |
| Federated High Income Bond | High Yield Bond | Corp Bond-High Yield | 1,630 | 1.220 | 0.807 | 0.413 | 6,731,074 |
| Totals | | | | | | | 81,924,754 |

104.    An excess operating fee load of ***almost $82 million annually*** over and above average mutual fund costs is a fee structure that is out of control and in need of adjustment in accordance with proper fiduciary standards.

105.    Another way of demonstrating grossly unfair fees, and the service-providers' unwillingness to pass on to the Funds and their shareholder benefits from economies of scale, is to explore fee charges within the complex and within the funds over time.  This is shown by the set of spreadsheets attached as Exhibits 6., 7. and 8.   An analysis of the individual Fund asset/cost data spreadsheets confirms the Funds have been saddled with runaway expense charges by Defendants as a matter of Defendants' systematic business practices:

- **Federated Kaufmann Fund** (see Exhibit 6): From 1996 through 2004, assets held by the Kaufman fund increased by 28 percent, from $5.34 billion to $6.86 billion.  Over the same period, advisory fees net of waivers or reimbursements not only grew greatly in dollar terms, from $60 million to $82 million, but also in terms of a percentage of net assets, from 1.03 percent to 1.19 percent.  Rather than seeing an increase in size yielding economies of scale, the Kaufman Fund's growth yielded only fee hikes passed on to the Fund's shareholders.   The experience with other expense items is even more dismal.  In 1996, shareholder service fees amounted to $14 million, or .23 percent of net assets.  In 2004, these same fees had more than doubled, ballooning to $31 million, accounting for .45 percent of net assets.  Thus, for both advisory and service fees asset growth furnishes no economies to be enjoyed by shareholders, only escalating costs and escalating profits for the service provider Defendants.  Symptomatic of price gouging by Kaufman fund's service providers and dereliction of duty by its

directors is the fact that over the three year period, from 1998-2000, the Kaufman Fund was forced to pay $1.33 million in so-called auditing fees.  Over those same three years, the Capital Income Fund and the Federated High Income Bond Funds combined paid $124,000 in audit fees, less than one-tenth as much as Kaufman paid for the same services.

- **Federated Capital Income Fund** (see Exhibit 7): From 1995 through 2004, Capital Income Fund featured the same pattern as Kaufman with inflated advisory fees.  In 1995, assets of nearly $820 million, yielded net advisory fees after waivers and reimbursements of $4.66 million, reflecting an advisory fee expense ratio of .56 percent.  Ten years later, at the end of 2004, assets had decreased to $491 million, and advisory fee income had decreased as well, to $3.6 million.  What had not decreased was the expense ratio of advisory fees to assets, which soared from .56 percent to more than .73 percent.

- **Federated High Income Bond Fund** (see Exhibit 8): Federated High Income Bond Fund also features bloated advisory fee and expense ratios.  From March of 1994 through November of 2004, Federated High Income Bond Fund's assets grew impressively, from $464 million to $1.7 billion, and increase of 370 percent.  Net advisory fees (after waivers and reimbursements) grew faster, rising from $3.2 million to $14.1 million, an increase of 440 percent.  Fees for service from the fund's transfer agent and dividend disbursing agent grew over the same period by 490 percent, from $416,000, to $2.04 million.  Likewise, the High Income Bond Fund's shareholders services fees exploded from around $790,000 in March of 1994, to $4.6 million in 2004, an increase of 580 percent.

106.    The refrain demonstrated by the spreadsheets in Exhibits 6 through 8 is asset size gains lead to outsized expense increases for fund shareholders, whereas asset size drops are accompanied by either expense increases or disproportionately small expense ratio declines.  The picture is clear:  the Funds are being managed for the benefit of the service providers, not for the benefit of fund shareholders.  Defendants have been engaging in flagrant breaches of fiduciary duty, preferring their pecuniary interests to the best interests of the Funds and the Funds' shareholders they are mandated by law to serve and protect.

### *(4) The Profitability of the Fund to the Adviser/Manager*

107.    The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.  However, upon information and belief, Defendants' reporting of their revenue and costs is intended to, and does, obfuscate Defendants' true profitability.

108.    Following discovery of this information, Defendants' true profitability can be determined on either an incremental basis or a full-cost basis.  Defendants' incremental costs of providing advisory services to Plaintiffs are believed to be nominal while the additional fees received by Defendants are hugely disproportionate given that the nature, quality, and level of the services remain the same.  On information and belief, a review of Defendants' full costs of providing advisory services will also demonstrate the enormous profitability to Defendants of managing the Funds.

### (5) Fallout Benefits

109.    Defendants indirectly profit because of the existence of the Funds through fallout benefits.  Indeed, it was the rush to capitalize on "fallout benefits" available to mutual fund mangers that fed the late-trading/market timing misbehavior engulfing numerous fund sponsors, including Federated.  These obvious, but difficult to quantify fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Funds.

110.    Other, easier to quantify, benefits include "soft dollars" payable from broker-dealers.  Essentially, "soft dollars" are credits furnished to Defendants from broker-dealers and other securities-industry firms in exchange for routing the Funds' securities transaction orders and other business to paying firms.  These soft-dollar credits should be used to purchase research and other goods or services that benefit the shareholders of the Funds.  On information and belief, however, the soft-dollar arrangements benefit Defendants and result in increased costs to

the shareholders of the Funds with little to no corresponding benefits to the shareholders of the Funds.

111.    Defendants receive further fallout benefits from securities lending arrangements. Essentially, Defendants loan out the securities of the Funds and receive compensation as the lending agents of the Funds.

112.    A highly profitable fallout benefit to Defendants is the ability to sell investment advisory services paid for by the Funds at virtually no additional cost.  Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendants.  Without payment by Plaintiffs and other shareholders of the Funds of millions of dollars in advisory, administrative, and distribution fees (especially distribution fees that are nothing more than a means to extract additional compensation for advisory services), Defendants would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients.  This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business.  However, although Plaintiffs and other shareholders of the Funds pay all of the costs associated with the investment advisory services, Defendants resell these services to third parties without compensating Plaintiffs through reduced fees or in any other way.

113.    On information and belief, Defendants do not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Funds or to the Funds' directors.  The evidence demonstrating the validity of this allegation is believed to be within Defendants' sole possession.

114.   The directors are thus unable to quantify or even meaningfully consider the benefits.  Plaintiffs and other shareholders of the Funds have paid for these benefits and are entitled to compensation in the form of reduced advisory and administrative fees and the elimination of distribution fees.

### (6) The Independence and Conscientiousness of the Directors

115.   The fees paid to Defendants are technically approved by the Funds' boards trustees or directors.  A majority of the Funds' Boards are comprised of statutorily presumed "disinterested" trustees or directors as that term is defined in § 10 of the ICA.  Federated has a common Board who oversees and monitors well over 130 portfolios in the Fund Complex. Regardless of whether these presumably "disinterested" trustees or directors meet the requirements of § 10 of the ICA, there is a lack of conscientiousness by the trustees and directors in reviewing the advisory, administrative, and distribution fees paid by each of the Funds.

116.   Even if statutorily disinterested, the trustees and directors are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiffs and other shareholders of the Funds.  In particular, Defendants do not provide the trustees or directors with sufficient information for them to fulfill their obligations, a factor supporting a finding that Defendants have breached their fiduciary duties.

117.   Defendants have adopted 12b-l Distribution Plans for the Funds.   These Distribution Plans must be reviewed annually by the Funds' Boards.  In particular, the Board must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued."  17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all aspects of the Board's deliberation, and the Board must conclude "in light of their fiduciary duties under state law and under Sections 36(a)

and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-l(e).

118.    Despite the fact that Plaintiffs and the other shareholders of the Funds have enjoyed no benefits from the Distribution Plans even though they contributed to the growth of fund assets by paying distribution fees, and despite the fact that the Distribution Plans have allowed Defendants to extract additional and excessive compensation from Plaintiffs and the other shareholders of the Funds, the trustees and directors of the Funds have continued to approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1 and § 36(b). A recent report written by Dr. Lori Walsh, financial economist at the SEC, studied "whether shareholders do, in fact, reap the benefits of 12b-1 plans." It states:

> Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee. In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire amount of the fee. This study confirms these results using a more recent dataset. . .
>
> In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth. This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans. . .
>
> 12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund. Although it is hypothetically possible for most types of funds to generate sufficient scale economies to offset the 12b-1 fee, it is not an efficient use of shareholder assets. . . Fund advisers use shareholder money to pay for asset growth from which the adviser is the primary beneficiary through the collection of higher fees.

Lori Walsh, The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns (2004) at 4, 18.

119.    Nevertheless, despite the fact that a financial economist at the SEC confirms, consistent with overwhelming empirical evidence drawn from numerous scholarly studies, that shareholders reap no benefits from 12b-1 plans and that 12b-1 fees are "not an efficient use of shareholder assets," the trustees and directors of the Funds repeatedly have approved the Distribution Plans in violation of their duties under sections 12 and 36(b) and rule 12b-1 both to the fund and to its shareholders, including plaintiffs.

120.    The Funds' Distribution Plans have not been adopted in accordance with the rules.  The Board did not find that the Distribution Plans in general or the Distribution Fees in particular benefit the Funds or its shareholders by generating savings from economies of scale in excess of the cost of the plan. In fact, despite the dramatic growth in total assets held by the Funds, both the management fee (including the Portfolio Selection Fee) and total 12b-l Distribution Fees (including Distribution Fees) received by Defendants have grown over time, thus depriving the Funds of the benefit of these economies of scale in breach of Defendants' fiduciary and other duties.

121.    As discussed in the introduction, the members of the respective Boards of the funds at issue in this Complaint simultaneously serve on the Boards of over 40 mutual funds in the Fund Complex which comprise over 130 portfolios.

122.    The mutual fund boards typically meet each calendar quarter at a simultaneous meeting for all mutual funds, and they are paid a fee from each separate mutual fund, which means that by attending a single board meeting, the trustees and directors receive numerous separate fees.  As a result, board membership in the Fund Complex is a lucrative part-time job, the continuation of which is dependent (at least in part) on the continued good will and support of Defendant.  *See also*, Inherent Conflict in the Structure of Mutual Funds, Section III.B., *supra*.

123.    At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the ICA.  As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser.  This conflict arises because the fees paid by the shareholders represent revenue to the adviser.  The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest.  *Burks v. Lasker*, 441 U.S. 471 (1979).

124.    The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the advisory, administrative, and distribution fees received by Defendants.  Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services.  See GAO Report at 14 (Ex. 4).  These responsibilities are intensive, requiring the directors to rely on information provided by Defendants.  Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.  *See* 15 U.S.C., § 80a-15(c); 17 C.F.R. § 270.12b-1.

125.    The ICA contains a presumption that the disinterested directors are, in fact, disinterested.  However, the lack of conscientiousness of even disinterested members of the Boards in reviewing the fees paid by the Funds, the lack of adequate information provided to the Board members in connection with their approvals of the advisory agreements, administrative agreements, and Distribution Plans, and the control of management over the trustees and directors in reviewing the fees paid by the Funds are not presumed but, rather, are important

factors recognized in the *Gartenberg*[6] line of cases in determining whether Defendants have breached their fiduciary duties.  In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser.  For example, the SEC has stated that "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently."  Bearing of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444 at *36 (Oct. 28, 1980).

126.   On information and belief, as part of their scheme to receive excessive fees, Defendants did not keep the trustees and directors fully informed regarding all material facts and aspects of their fees and other compensation.  Further, an independent and loyal Board would not have tolerated the fee levels charged by Defendants or the conduct of the service providers if they had obtained adequate information regarding, among other things: the advisory fees charged to pension and other institutional clients or to other mutual funds being advised or sub-advised by Defendants; the economies of scale enjoyed or fallout benefits received by Defendants; the profitability data (and how to evaluate the profitability data in light of economies of scale); and the Distribution Plans and the benefit to the shareholders of the plans (such as whether the Distribution Plans should have been implemented and whether they should have been continued).

127.   On information and belief, the trustees and directors rarely, if ever, question any information or recommendations provided by Defendants.  The evidence needed to establish the

---

[6]  *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

truth of these allegations is believed to be exclusively in the control of Defendants and is not in Plaintiffs' possession at this time.

128.    The foregoing assures that the trustees and directors do not understand Defendants' true cost structure and, in particular, the economies of scale enjoyed by them in providing investment advisory services to the Funds and their institutional and other clients.  Nor do the trustees or directors understand the nature of the Distribution Plans and the benefits received by Defendants, and lack of benefits received by Plaintiffs, from the Distribution Plans. Had Defendants kept the Board properly advised, surely Defendants Morningstar rankings would not be so low; nor would Federated funds have some of the highest fees in the industry.

129.    On information and belief, the disinterested trustees and directors of the Funds have not received the benefit of any measures to enhance their ability to act independently, which has caused them to be dependent on Defendants and has allowed Defendants to dominate and unduly influence them.  In addition, the failure of the trustees and directors to insist on adequate information evinces a lack of care and conscientiousness on their part.

**COUNT I**
**ICA §36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive Fees)**

130.    Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and specifically state they do not allege or seek relief for any claims based upon improper market timing or late trading activity involving the Funds.

131.    The fees charged by Defendants for providing advisory services to the Funds represent a breach of Defendants' fiduciary duty to the Funds because they are excessive and

were not negotiated at arm's length in light of all the surrounding circumstances, including the advisory fees that Defendants charge their other clients.

132.     The Funds likewise, as discussed above, have been victimized by grossly excessive, outsized, and unfair administrative fees.  These administrative fees are extracted by and/or caused to be paid by Defendants in violation of their fiduciary duties under ICA § 36(b); to the extent the fees flow to Defendant either directly or as a control person of an affiliate, they violate ICA § 36(b) and/or ICA § 48(a).  Plaintiffs specifically allege that all excessive fees alleged herein have inured to the benefit of, and been received by, Defendants.

133.     In charging and receiving excessive or inappropriate compensation, and in failing to put the interests of Plaintiffs and the other shareholders of the Funds ahead of their own interests, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

134.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

## COUNT II
## ICA § 36(b)
## BREACH OF FIDUCIARY DUTY
### (Excess Profits from Economies of Scale)

135.     Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and specifically state they do not allege or seek relief for any claims based upon improper market timing or late trading activity involving the Funds.

136.     Defendants have received and continue to receive excess profits attributable to extraordinary economies of scale and, ironically, at least in part at Plaintiffs' expense in the form of payment of distribution fees benefiting only Defendants.

137.     By retaining excess profits derived from economies of scale derived from distribution charges, and other inflated cost items, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

138.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**ICA § 36(b)**
**(Excessive Rule 12b-l Distribution Fees and Extraction of**
**Additional Compensation for Advisory Services)**

139.     Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and specifically state they do not allege or seek relief for any claims based upon improper market timing or late trading activity involving the Funds.

140.     The distribution fees charged and received by Defendants were designed to, and did, extract additional compensation for Defendants' advisory services in violation of Defendants' fiduciary duty under § 36(b).  Although the distribution fees may have contributed to the growth in assets of the Funds, the resulting economies of scale benefited only Defendants, and not Plaintiffs or the Funds.

141.     In failing to pass along economies-of-scale benefits from the distribution fees, and in continuing to assess distribution fees pursuant to plans of distribution despite the fact that no

benefits inured to Plaintiffs, Defendants have violated, and continue to violate, the ICA and have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

142.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

WHEREFORE, Plaintiffs demand judgment as follows:

C.    An order declaring that Defendants have violated and continue to violate § 12, § 36(b), and Rule 12b-l of the ICA and that any advisory, administrative, service or distribution agreements entered into are void ab initio;

D.    An order preliminarily and permanently enjoining Defendants from further violations of the ICA;

E.    An order awarding damages against Defendants including all fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

F.    Such other and further relief as may be proper and just.


Dated: January 13, 2006


Ellen M. Doyle, Esquire
MALAKOFF DOYLE & FINBERG PC
The Frick Building, Suite 200
437 Grant Street
Pittsburg, PA 15219-6003
Telephone: (412) 281-8400
Facsimile:  (412) 281-3262


   /s/Michael D. Woerner
Lynn Lincoln Sarko, *pro hac vice*
Michael D. Woerner, *pro hac vice*
Tana Lin, *pro hac vice*

Gretchen F. Cappio, *pro hac vice*
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Ron Kilgard
Gary Gotto
KELLER ROHRBACK P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ  85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

Michael J. Brickman
James C. Bradley
Nina H. Fields
RICHARDSON,   PATRICK,   WESTBROOK   &
BRICKMAN, LLC
174 East Bay Street
Charleston, SC  29401
Telephone: (842) 727-6500
Facsimile: (843) 727-3103

Guy M. Burns
Jonathan S. Coleman
Becky Ferrell-Anton
JOHNSON, POPE, BOKOR, RUPPEL & BURNS,
L.L.P.
100 North Tampa Street, Ste. 1800
Tampa, FL  33602
Telephone: (813) 225-2500
Facsimile: (813) 223-7118

*Counsel for Plaintiffs*